NATIONAL HYGIENICS, INC.,
Plaintiff-Appellant,

v.

SOUTHERN FARM BUREAU LIFE
INSURANCE CO., et al.,
Defendants-Appellees.

No. 82–4157.

United States Court of Appeals,
Fifth Circuit.

June 13, 1983.

Betty A. Morgan, Robert H. Weaver, Jackson, Miss., for plaintiff-appellant.

James B. Persons, Biloxi, Miss., Stanford E. Morse, Jr., Gulfport, Miss., William C. Walker, Jr., Univ. of Miss. Law Center, University, Miss., for defendants-appellees.

Before RANDALL and HIGGINBOTHAM, Circuit Judges, and McDONALD *, District Judge.

* District Judge of the Southern District of Texas, sitting by designation.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal is from a summary judgment in a diversity case granted by a magistrate. Finding a genuine issue of material fact we reverse and remand for trial.

In 1971 a group of doctors in Biloxi, Mississippi established Coastal Professional Association. Members of that group also established Gulf Limited Partnership to operate a clinic in Biloxi for the practice of Coastal's doctors. Most partners in Gulf were shareholders in Coastal. In January 1975 Southern Farm Bureau Life Insurance Company and Central Life Assurance Company loaned Gulf approximately $2.4 million for the construction of the clinic. The loan was secured by a deed of trust on the clinic, an assignment of Gulf's lease with Coastal, and the personal guaranty of the doctors of Coastal to pay their pro rata share of the annual lease payment.

During the latter part of 1975 Coastal became delinquent in its lease payments to Gulf and Gulf in turn became delinquent in its loan payments to Southern and Central. Southern, Central, and Gulf then modified their agreement in January 1976 by reducing Gulf's monthly loan payments. Coastal's lease payments were reduced in proportion.

In July 1976, the general partner of Gulf, Bobby Bell, requested that Coastal pay an additional $1,000 to Gulf. Coastal refused. Bell then advised Coastal by letter dated July 19, 1976, that Gulf could no longer afford to run the Medical Center Building Complex and would be closing it down. The letter stated that Gulf planned to close the clinic because Coastal could not make the $1,000 payment:

July 19, 1976

Dr. Harrell S. Pace, M.D.
President
Coastal Medical Center, P.A.
P.O. Box 4080
Biloxi, Mississippi 39531
Dear Dr. Pace:

I very much regret receiving your letter of July 12, 1976. In this letter you

informed me that the C.M.C.P.A. could not approve a $1,000 payment toward the debt to the GLPF.

Since there were no details or explanations given or offered in this letter, I must assume that the P.A. either does not have the funds or simply does not wish to make the payment.

The G.L.P.F. based on your decision, can no longer afford to operate the Medical Center Building Complex.

As of the July payments, I will withhold, making any further payments on the building mortgage or lease payments to Litton Industries.

I recommend a meeting between the Board of Directors of the C.M.C.P.A. and myself to discuss the consequences of action by the G.L.P.F. which will close the medical center building.

It is with deep regret that I feel this action must be taken but I see no plausible reason for the continuance of these struggles.

> Sincerely yours,
> /s/ Robert W. Bell
> Robert W. Bell as
> General Partner, GLPF

Shortly after receiving the letter Coastal arranged a meeting with Southern. Bell was not told of the meeting and did not attend. There is a dispute as to whether any arrangements were made at this meeting for Coastal to deal directly with Southern and Central and eliminate Gulf and Bell altogether. This much is clear: at the meeting Coastal discussed the letter from Bell and suggested to Southern that Gulf would make no further payments on the loan. Coastal also advised Southern that its physicians wanted to remain in the building.

On the first business day following the meeting, Coastal's attorney informed Central of its meeting with Southern. Three days later, on August 5, 1976, Southern and Central exercised their right of assignment of the lease and directed Coastal's payment to them. On January 5, 1977, Central and Southern foreclosed on the building. Central and Southern then purchased the building at the foreclosure sale. In March of 1977 the clinic was sold to the Coastal Company, a general partnership drawn from shareholders of Coastal Professional Association.

Throughout this period, National Hygienics was prosecuting a suit against Gulf filed in 1974 in a Mississippi state court. In July 1979, over two years after the foreclosure and sale of the building, the state court suit was settled through entry of an "Agreed Decree and Assignment of Assets." The decree released the general partners of Gulf from any personal liability and awarded National Hygienics $300,000. Gulf then had only $21,000 in tangible assets. The decree assigned to National Hygienics all of Gulf's tangible and intangible assets, including its claims against Coastal, Southern, and Central, except for 20 percent of any net recovery by National against Coastal, Southern, and Central.

As assignee, National filed this diversity action claiming: (1) unlawful interference by Coastal with the mortgagor-mortgagee relationship between Gulf and Central and Southern; (2) unlawful interference by Southern and Central with the lease between Coastal and Gulf; and (3) conspiracy to interfere with and injure the business of Gulf by Coastal, Southern, and Central. All parties consented to trial before a magistrate. The magistrate granted summary judgment to the defendants, finding that: (1) Coastal had standing to contest the assignment from Gulf to National; (2) the assignment was invalid because the general partner (Bell) had acted in violation of Mississippi partnership law; (3) Coastal, Southern, and Central were privileged to proceed in the manner they did regardless of injury to Gulf; (4) there was no unlawful or improper motive in either Coastal's, Southern's, or Central's actions and hence no unlawful conspiracy to interfere with the partnership's business. National appeals this judgment.

■ We pause to note the standard of review. In reviewing summary judgment

we must consider the record in the light most favorable to the party opposing the motion. If there is a genuine issue of fact which could cause the dispute to reasonably be resolved in favor of the party opposing the summary judgment, the judgment cannot stand. *Marshall v. Victoria Transportation Co.,* 603 F.2d 1122, 1123 (5th Cir.1979). With this standard in mind we turn to analysis of this case. We apply Mississippi law here, a largely predictive exercise.

### "Standing" to Challenge the Assignment

National argues that Coastal has no "standing" to contest the validity of the assignment from Gulf to National. This argument is without merit. National must prove the validity of the assignment on which it sues. "Unless the defendants admit the assignment under which the plaintiff claims, it is incumbent upon the plaintiff to prove a valid assignment in order to show that he has a cause of action." 6 Am.Jur.2d *Assignments* § 136 (1963).

It does not necessarily follow that Coastal may challenge the assignment on *any* ground:

If, however, the assignment is effective to pass legal title, the debtor cannot defend by interposing matters or objections which merely affect the validity of the assignment as between the assignee and assignor or render it voidable at the latter's election, or the election of his creditor. The debtor cannot question the motive or purpose underlying the assignment, or introduce a defense that the assignee occupied a fiduciary relationship to the assignor. Also, various other defenses have been held not available to the debtor.

6A C.J.S. *Assignments* § 115 (1975). This language, while somewhat obscure and circular, suggests that a defendant may object to the formal validity of an assignment, but not otherwise. Coastal's objections are not formal: it contends that Bobby Bell lacked authority to bind Gulf Limited Partnership.

We have no Mississippi case law on point. In the absence of controlling authority we will decline to reach the question of Coast-

al's "standing," because, as will be seen below, we conclude in any event that the assignment is valid as a matter of law.

### Validity of the Assignment

Coastal claims that the assignment is invalid because Gulf's general partner, Bell, was acting beyond the scope of his authority. Specifically, Coastal contends that Bell violated three subsections of § 79–13–19 the Mississippi Uniform Limited Partnership Act.

The three subsections allegedly violated provide:

(1) A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to:

. . . . .

(b) Do any act which would make it impossible to carry on the ordinary business of the partnership.

(c) Confess a judgment against the partnership.

(d) Possess partnership property, or assign their rights in specific partnership property, for other than a partnership purpose.

Miss.Code Ann. § 79–13–19. We will treat Coastal's contentions seriatim.

### (a) Confession of Judgment

Mississippi has no cases to guide our inquiry into whether Bell's assignment was a confession of judgment. The magistrate reasoned that it was a "consent judgment" and that this was equivalent to a confession judgment. This was error. Although both have the same preclusive effect, *Guthrie v. Guthrie,* 266 Miss. 190, 84 So.2d 158, 161 (Miss.1955), a consent judgment is in the nature of a bilateral contract as to what the decision should be, while a confession of judgment involves a unilateral concession by the defendant that plaintiff's cause is

just and right. *Id.;* Annotation, 2 A.L.R.2d 514, 516–17 (1948).

The president of National, Sheldon Pollack, testified that there were extensive negotiations between National and Bell and Gulf over the settlement of National's claims. The final decree limited the assets which National could draw upon to satisfy its judgment by allowing Gulf to retain an override interest. As such the final decree was far less than what National asked for. The decree, in other words, was a compromise of a suit, not a confession of judgment. To hold otherwise would, as we will emphasize again below, impair the ability of general partners to settle a limited partnership's legal disputes.

### (b) Assignment Other Than for a Partnership Purpose

The assignment had a specific provision releasing Bobby Bell from personal liability. Coastal claims that the assignment was executed to relieve Bell's own liabilities and hence was done for "other than partnership purposes." If the assignment was for other than partnership purposes then, according to Coastal, Bell was acting outside of his authority and the partnership is not bound.

 Our inquiry is somewhat different than that proposed by Coastal. It is one of apparent rather than actual authority. Even if Bell acted outside the scope of his actual authority, that is not sufficient for Coastal to avoid the effects of the assignment. Bell must have been acting outside the scope of his apparent authority. The partnership is responsible for cloaking Bell with the appearance of vast actual authority via his position as general partner. As long as Bell had the *appearance* of acting within that authority, the partnership is bound. *Cue Oil v. Fornea Oil Co.,* 208 Miss. 810, 45 So.2d 597, 599 (Miss.1950).

 The crucial inquiry is one of notice. Under Mississippi law if National was aware of or reasonably should have been aware that the agent was not acting within the scope of his authority, then there was no "appearance" of authority and Gulf is not bound. *Crabb v. Comer,* 190 Miss. 289, 200 So. 133, 135 (Miss.1941). In this connection Coastal argues that Bell's personal release from liability should have put National on notice that Bell was acting not for partnership purposes but rather for his own. The argument sweeps too broadly, for whenever a general partner settles a partnership debt that potentially exceeds partnership assets for less than the amount of assets of the partnership he is in an absolute sense protecting himself. He is generally only personally liable after all the assets of the partnership have been exhausted. Hence, any settlement that allows the partnership to retain assets when there is a potential debt in excess of partnership assets protects the general partner. By Coastal's argument it follows that any such settlement would exceed the scope of the general partner's apparent authority. This would significantly undercut the general partner's authority to settle any disputes, despite the important role such authority has in managing a partnership. A holding that effectively forbids the general partner from settling disputes on his own would significantly diminish the general partner's capability to effectively administer the partnership's affairs. In view of Mississippi's statutory commitment to this form of business, we do not believe the Mississippi Supreme Court would so choose to read his authority.

 In this case a claim against the partnership has been extinguished. The partnership has retained a 20 percent interest in a claim with the prospect that this percentage might bring significant revenues with which to revitalize the partnership. The deal may or may not have been wise from the perspective of the partnership interest. As a matter of law, we hold that the personal release granted to Bell was insufficient to deny Bell apparent authority to bind Gulf.

### (c) Impossible to Carry on Ordinary Business Purposes

Coastal also argues that the assignment made it impossible to carry on the ordinary

business purposes of the partnership. Coastal claims that the ordinary business purpose of the partnership was the operation of the clinic, an endeavor made impossible by the assignment of all the assets.

National replies that the assignment did not make it impossible to carry on the ordinary business purposes of the partnership, because (a) at the time of the assignment the partnership was not operating the clinic, and (b) the assignment provided Gulf with a 20 percent override of the net recovery in this lawsuit against Coastal, Central, and Southern which could blossom into sufficient funds to make it possible for Gulf to build and manage another clinic. Finally, National argues that it did not know and should not be charged with knowing what the ordinary business purposes of Gulf were.

■ We need not reach the latter two arguments because we agree with National's first point. The record clearly reflects that two years before the settlement and assignment, the clinic was foreclosed upon and sold and that the partnership's business had been dormant ever since. On this record, there is no genuine issue of fact on the question whether the assignment made it impossible to carry on the ordinary business purposes of the partnership which could be resolved in favor of the defendants.

■ Having addressed all of Coastal's challenges to the validity of the assignment and found all to be without merit, we conclude that the magistrate erred in his determination that the assignment was invalid.

### The Interference Claim

We turn now to the interference claim itself. The magistrate found that there was no genuine issue of material fact with respect to the interference claim. We disagree.

National, Gulf's assignee, claims that the actions of Coastal, Southern, and Central which resulted in the foreclosure and sale of the building were done with the malicious intent of getting rid of Gulf and Bobby Bell, and hence constitute an illegal interference with Gulf's contractual relationships.

The elements of a claim for illegal interference with contractual relations are outlined by the Mississippi Supreme Court in *Irby v. Citizens National Bank of Meridian,* 239 Miss. 64, 121 So.2d 118 (Miss.1960). The court there stated, "A prima facie case of wrongful interference with a contract is made out if it is alleged (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted." *Id.* at 119.

It is undisputed that three of the required components of this cause of action are present in this case. There is no question that the act of conferring directly with Southern by Coastal was done intentionally. There is also no question that injury was done to Gulf and that Coastal was aware such injury might result from the action. The difficult issue, as the magistrate recognized, is whether the meeting and later actions by Coastal, Southern, or Central were motivated by a malicious desire to rid themselves of Bobby Bell and Gulf or solely by a justifiable concern over staying in practice and insuring lease payments. The magistrate, citing the pursuit of these legitimate interests by Coastal, Southern, and Central, determined that they were privileged in their actions.

That Coastal, Southern, and Central all had legitimate interests will not alone warrant summary judgment. In *Memphis Steam Laundry-Cleaners v. Lindsey,* 192 Miss. 224, 5 So.2d 227, 231–32 (Miss.1941), the Mississippi Supreme Court held that one may not seek legitimate ends through the use of a wrongful motive or purpose; bad purpose, in other words, may make wrongful conduct otherwise privileged. The overriding force of improper motive has long been recognized under Mississippi Law. *Standard Fruit and Steamship Co. v. Put-*

*nam,* 290 So.2d 612 (Miss.1974); *Wagley v. Colonial Baking Co.,* 208 Miss. 815, 45 So.2d 717 (Miss.1950). The magistrate stated that there is "nothing in the record which would indicate the existence of any conduct by the Defendants which *could* be construed as wrongful, mistakable or justified with malice" (emphasis added). We disagree.

The record permits a reasonable inference of malice between the members of Coastal and Bell. Dr. Pace, the president of Coastal, testified in his deposition that Coastal had tried but could not "get rid of" Bell. He testified that Bell and Gulf in general were mismanaging the clinic and that the members of Coastal "were fed up with them." These statements establish a basis for believing there to be ill will between Coastal and Bell. They could reasonably lead to a conclusion that Coastal's actions in dealing with Southern and Central were outside Mississippi's zone of privilege.

In July 1976 Bell requested that Coastal pay an additional $1,000 to Gulf. Coastal refused. Bell then sent the letter advising Coastal that Gulf was closing the clinic because of Coastal's unexplained denial of the request for additional funds. The letter could reasonably have been interpreted as a request for reconsideration of Coastal's decision. Bell concluded it by recommending "a meeting of the Board of Directors of [Coastal] and [himself] to discuss the consequences of action by [Gulf] which will close the [clinic]." This and other statements arguably implied that Bell was willing to negotiate. In context the letter as a whole could have been viewed as an overture for discussion. Coastal chose to read it differently.

Upon receipt of the letter Coastal immediately set up the meeting with Southern to discuss the action to be taken to avoid the closing. Coastal did not invite Bell or inform him of the meeting. Because the lease was assignable to Southern and Central, assignment of the lease and the elimination of Gulf were obvious potential results of the meeting. Given the backdrop of ill will between Bell and the members of Coastal, the assertion that Coastal used

Bell's letter as a pretense to accomplish its legally unjustifiable long-desired goal of getting rid of Bobby Bell is not implausible. That plausibility is reinforced by the fact that Central and Southern acted almost immediately after the meeting to exercise their assignment of the lease and by the fact that in the end the building was foreclosed and purchased by Southern and Central and then sold to Coastal's successor.

■ We decide no factual disputes. We do find, however, that there is a genuine issue of material fact as to whether the complained-of actions of Coastal, Central, and Southern were motivated by malice. This finding would be sufficient to sustain National's claim for intentional interference. We hold that the assignment was valid as a matter of law, and, viewing the record in the light most favorable to appellant, we conclude that there may have been an intentional interference with Gulf's contractual relationships. We reverse the grant of summary judgment and remand for trial.

REVERSED and REMANDED.