BRITISH CALEDONIAN AIRWAYS LIMITED, Plaintiff-Appellant,

v.

FIRST STATE BANK OF BEDFORD, TEXAS, Defendant-Appellee.

Nos. 86–2616, 87–2020.

United States Court of Appeals, Fifth Circuit.

June 19, 1987.

Rehearing Denied in No. 86–2616 July 20, 1987.

Robert L. Weinberg, Washington, D.C., Edward B. McDonough, Jr., Houston, Tex., for plaintiff-appellant.

Kevin F. Risley, Houston, Tex., for defendant-appellee.

Before RUBIN, RANDALL, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

British Caledonian Airways, Ltd. (British Caledonian) appeals from an adverse summary judgment entered in a suit against First State Bank of Bedford (Bedford Bank). The suit arose out of Bedford Bank's processing of a check on an endorsement forged by one of British Caledonian's employees. British Caledonian raises issues concerning the standard of "good faith" under the Texas Uniform Commercial Code, the interpretation of a restrictive endorsement, irregularities in the check, and the interest that the dishonest employee intended the payee to have in the check. British Caledonian also appeals the district court's denial of a Fed.R.Civ.P. 60(b) motion based on new evidence. For the reasons outlined below, we affirm.

I. BACKGROUND

In March 1980, J. Roland Savoie, a dishonest employee of British Caledonian Airways, arranged to have British Caledonian write a check for $116,000 to Mary Tull Charter Services on British Caledonian's account at the Texas Commerce Bank. Savoie's mother, Simone Gauthier, took the check to the defendant, the Bedford Bank, around March 10, 1980, and presented it to teller Jean Tedrow. On the back of the check, the following lines appeared, all in the same person's handwriting:

Mary Toll
Charter Services
to deposit
068-777-2.

Plaintiff's Exhibit No. 1, Record Vol. 1 at 227. The account number, 068–777–2, corresponded to a Bedford Bank account in the name of P O M International controlled by Savoie. Gauthier deposited the check in that account. On March 17, 1980, Gauthier also purchased a cashier's check from Preston State Bank for $30,600, payable to Mary Tull Charter Services. Mary Tull had actually performed charter services for British Caledonian, for which some payment was due.

Bedford Bank sent the $116,000 check to Texas Commerce for collection, accompanied by a routine "collection letter" form that listed the payee as "Mary Tull Services (P O M International)." Texas Commerce cleared the check, and on March 31, 1980, Bedford Bank credited the $116,000 to P O M's account. On the same day, Mary Tull cashed the $30,600 cashier's check at another bank.

British Caledonian eventually discovered the defalcation, and brought suits against Savoie, Texas Commerce, Bedford Bank and other parties. On April 14, 1986, the district court granted summary judgment to Bedford Bank on the grounds of Tex. Bus. & Comm.Code Ann. § 3.405(a)(3) (Vernon's 1968) (Tex.U.C.C. or the Code). In the fall of 1986, British Caledonian deposed B.F. Robinson, the officer of Bedford Bank who had initialled the $116,000 check, in the suit against Texas Commerce; it also recovered the collection letter from Texas Commerce. Armed with this "new evidence," British Caledonian moved the district court under Fed.R.Civ.P. 60(b) to vacate the judgment. The district court denied the motion. This appeal consolidates British Caledonian's appeal from the summary judgment and from the denial of its Rule 60(b) motion.

## II. DISCUSSION

### A. *Timeliness of Bedford Bank's Motion for Summary Judgment Under Section 3.405*

Bedford Bank raised the possibility of a section 3.405 defense in February 1984, in the answer to British Caledonian's complaint. Both parties moved for summary judgment on other grounds. On November 1, 1984, a motions deadline set by the district court passed; on December 1, 1984, a discovery deadline passed. At a May 10, 1985, motions conference, the district court discussed Bedford Bank's section 3.405 defense with the parties at length. The district court also directed a deposition by a representative of British Caledonian, despite the expiration of the discovery deadline. On June 17, 1985, Bedford Bank filed a response to British Caledonian's summary judgment motion, again asserting a section 3.405 defense. Attached to this response were affidavits from Robinson and Wanda O'Rourke, Bedford Bank's custodian of records, concerning Bedford Bank's good faith in processing the $116,000 check. On November 20, 1985, Bedford Bank filed a Supplemental Motion for Summary Judgment on the basis of section 3.405. That motion relied on the same evidence cited in Bedford Bank's June 17 response. British Caledonian opposed Bedford Bank's motion both on timeliness and on the merits, but never moved to strike the Robinson and O'Rourke affidavits or to take additional discovery. On April 14, 1985, the district court granted summary judgment for Bedford Bank on section 3.405.

British Caledonian argues that Bedford Bank's Supplemental Summary Judgment Motion violated the district court's motions deadline and caught British Caledonian by surprise, depriving it of the chance to gather evidence to oppose the motion. We note that British Caledonian's own motion for summary judgment opened the door to allow the district court to grant summary judgment for Bedford Bank *sua sponte*, provided adequate warning and the other summary judgment requirements. *Landry v. G.B.A.*, 762 F.2d 462, 464 (5th Cir.1985); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2720 (2d ed. 1983). Moreover, British Caledonian was not unfairly surprised. Bedford Bank asserted the section 3.405 defense at the start of the case. As the original discovery deadline approached, British Caledonian could not safely forego

all discovery on section 3.405, since neither party could be sure that the case would be decided on the then-pending summary judgment motions. Even after the December 1, 1984, "discovery deadline" passed, the district court ordered another deposition. The importance of section 3.405 was again emphasized by Bedford Bank's June 17 response and its accompanying affidavits, evidence that British Caledonian would have to counter in order to prevail on its own summary judgment motion. In sum, British Caledonian knew for over two years that Bedford Bank would assert a section 3.405 defense, yet now claims that the district court deprived it of the opportunity to meet that defense. We decline to find error in the district court's actions.

## B. *Good Faith*

█ The district court granted summary judgment for Bedford Bank on the basis of section 3.405 of the Texas Uniform Commercial Code, which reads:

> (a) An indorsement by any person in the name of a named payee is effective if
>
> .    .    .    .    .
>
> (3) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

Often called the "imposter" or "padded payroll" rule, section 3.405 represents a policy decision to place certain losses on the employer:

> The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.

*Id.*, Comment 4: *Fidelity & Casualty Co. v. First City Bank of Dallas*, 675 S.W.2d 316, 318 (Tex.App.—Dallas [5th Dist.] 1984)

writ ref'd n.r.e.; *Clinton Weilbacher Builder, Inc. v. Kirby State Bank*, 643 S.W.2d 473, 476 (Tex.App.—San Antonio 1982). Whenever section 3.405 makes a forged endorsement effective, sections 4.207 and 4.401 preclude recovery against the collecting, depositary, or drawee bank. *Fidelity & Casualty Co.*, 675 S.W.2d at 318.

However, a bank cannot shelter behind section 3.405 if it does not meet the general U.C.C. requirement of "good faith," defined as "honesty in fact in the conduct or transaction concerned." Tex.U.C.C. §§ 1.203, 1.201(19). The district court held that Bedford Bank would be in good faith, despite any proof of negligence in cashing the $116,000 check, unless Bedford Bank actually knew that the endorsement was forged. British Caledonian argues that the district court forced it to meet too stringent a legal standard: proof that Bedford Bank should have known, from suspicious circumstances surrounding the check, is enough.

British Caledonian's position is contrary to Texas precedent. In a 1984 case, the Texas Supreme Court considered whether a bank acted in "good faith" in making payment on corporate checks bearing only one officer's signature, despite the fact that the corporation had filed with the bank a corporate resolution requiring two signatures. *La Sara Grain Co. v. First National Bank of Mercedes*, 673 S.W.2d 558 (Tex. 1984). The court held: "The test for good faith is the *actual belief* of the party in question, *not the reasonableness of that belief.*" *Id.* at 563 (emphasis added). The bank was found liable. British Caledonian argues that *La Sara Grain* actually establishes a "should have known" test, since the plaintiffs never proved that any of the employees of First National Bank of Mercedes (Mercedes Bank) actually looked up the corporate resolution before honoring the checks. However, Mercedes Bank's president testified "that the bank *would know* of anything that was in the files." *Id.* at 563 (emphasis added). The two pieces of information which Mercedes Bank did know—that two signatures were re-

quired and that the checks bore only one signature—added up to knowledge that the checks were unauthorized. *Id.* By contrast, the information available to Bedford Bank in the instant case did not, even when added up, amount to knowledge in the *La Sara Grain* sense. We will discuss in the following section whether the same evidence would have permitted a jury to *infer* actual knowledge.

Other Texas cases support our conclusion that actual knowledge is required. In *Bedford Bank & Trust Co. of Edinburg v. George,* the court refused a bank the benefit of the "holder in due course" doctrine of Tex.U.C.C. § 3.305(b) because the bank failed the good faith and notice tests. 519 S.W.2d 198 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). Concerning good faith, the court observed: "The test is not diligence or negligence; and it is immaterial that the bank may have had notice of such facts as would put a reasonably prudent person on inquiry which would lead to discovery, unless the bank had actual knowledge of facts and circumstances, that would amount to bad faith." *Id.* at 203. As in *La Sara Grain,* the bank in *George* had in its own records information sufficient to determine that check kiting was going on; moreover, one of the principals in the fraud was a director of the bank at the time. *Id.* at 201. Further support for the subjective "actual knowledge" requirement can be found in *The Richardson Co. v. First National Bank in Dallas,* 504 S.W.2d 812, 816 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.) (even though a dishonest employee applied a check made out to her employer to the employee's personal debt with the bank, the bank was entitled to assume that the employee was authorized to do so); and *Aetna Life and Casualty Co. v. Hampton State Bank,* 497 S.W.2d 80, 87–88 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.) (neither failure to follow normal banking practices nor gross negligence suffice to negate good faith). In sum, the district court did not err in requiring British Caledonian to prove that Bedford Bank had actual knowledge of the forgery.

### C. *Jury Issue on Actual Knowledge*

█ British Caledonian argues that, even under the "actual knowledge" standard, enough evidence was presented to create a genuine issue for the jury as to whether Bedford Bank knew that the check had been forged. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, this Court must view the evidence and draw inferences in favor of the opposing party. *National Hygienics, Inc. v. Southern Farm Bureau Life Ins. Co.,* 707 F.2d 183, 189 (5th Cir.1983); *Wilson v. Taylor,* 658 F.2d 1021, 1028 (5th Cir.1981).

█ British Caledonian presented no direct evidence that Bedford Bank or its employees knew of the forgery. However, British Caledonian did offer the following circumstantial evidence:

(1) The transaction purported to be one business' (Mary Tull's) payment of another business (P O M International) by endorsing over a third-party check from a third business (British Caledonian). Businesses do not usually pay their debts in this way.

(2) Simone Gauthier's attempt to deposit the check in P O M's account violated an apparent restrictive endorsement, "to deposit" written by Mary Tull Charter Services.

(3) The entire endorsement, although purporting to be two separate endorsements by two different businesses, was in the same handwriting.

(4) While the front of the check designates the payee as "Mary Tull Charter Services," the endorsement reads "Mary T oll Charter Services" (Plaintiff's Exhibit No. 1, Record Vol. 1 at 226–27 (emphasis added).

(5) The check was for a high amount, and therefore Bedford Bank's own procedures required approval from a Bank officer (Robinson).

As to contention (1), Bedford Bank replies that a business might endorse a check over to another for a number of reasons, including common ownership. Mary Tull Charter Services was not a Bedford Bank customer, and there was no evidence that Bedford Bank knew the nature of the rela-

tionship between Mary Tull and P O M International. As to contention (2), which will be discussed in greater detail below, it is not clear even today that Bedford Bank did violate the restrictive endorsement, for the words on the back of the check are ambiguous. If the endorsement is subject to several plausible interpretations, then the Bank's following one of these interpretations will not support an inference of bad faith. As to (3), the identity of handwriting, the teller, Tedrow, testified at her deposition in 1985 that she could see the identity in 1985; she did not recall noticing the identity in 1980, when the check was deposited.

The discrepancy in spelling the payee's name (contention no. 4) is a minor one, involving one letter in the name—"Tull" as opposed to "Toll." Both "Tull" and "Toll" appear to be normal English names. The names are handwritten, and Tedrow could have thought that one of the writers simply forgot to close the top of the "o" or that the other inadvertently closed a "u." British Caledonian points out that Mary Tull's representative, had the deposit been a legitimate transaction, would have known the correct spelling of the business' name. However, even if Tedrow noticed the "Tull/Toll" discrepancy, Tedrow need not have drawn the conclusion that the "Tull" on the front was correct and the "Toll" on the back erroneous. Tedrow could instead have inferred the converse: that the back was correct and the front erroneous. The mistake would then have been one business' mistake concerning the exact spelling of another business' name. The U.C.C. foresees that the writer of a check may misspell his payee's name, and allows the payee to negotiate such checks. Tex.U.C.C. § 3.203. Finally, as to contention (5), bank officer Robinson did in fact review the check, and could not recall noticing anything suspicious about the endorsement at the time.

The question is close; in some cases a large number of strong "should have knowns" may support a jury inference of "did know." The evidence in the instant case, however, is too weak to show more than negligence on the part of Bedford Bank. The district court did not err in granting summary judgment on this ground.

### D. The Restrictive Endorsement

Section 3.205 of the Texas U.C.C. defines a "restrictive endorsement" as an endorsement that contains words such as "for deposit." Sections 3.206(c), 3.404(a), and 3.419(c) make a bank that handles a check in violation of a restrictive endorsement liable to the true owner of the funds. *La Sara Grain*, 673 S.W.2d at 563–64; *Lone Star Beer, Inc. v. First National Bank*, 468 S.W.2d 930, 934–35 (Tex.Civ.App.—El Paso 1971, writ ref'd n.r.e.). British Caledonian argues that Bedford Bank violated a restrictive endorsement and that this separate ground of liability is not subject to the defense of Texas U.C.C. § 3.405.

The endorsement on the $116,000 check lends itself to at least three interpretations. First, all four lines can be read as a single endorsement by Mary Tull Charter Services, directing payment into a certain account: "Mary Toll/Charter Services/to deposit/068–777–2." By this interpretation, Bedford Bank followed the endorsement exactly, since Bedford Bank in fact deposited the proceeds of the check into the specified account.

According to a second possible interpretation, Mary Tull first made a nonrestrictive endorsement—"Mary Toll/Charter Services," and then transferred the check to P O M Services, which made a restrictive endorsement: "to deposit/068–777–2." Under this interpretation, Bedford Bank again followed the endorsement.

A third interpretation would read the first three lines together as constituting a restrictive endorsement by Mary Tull directing deposit to its own account: "Mary Toll/Charter Services/to deposit." The fourth line, "068–777–2," would constitute P O M International's endorsement. Only under this third interpretation would Bedford Bank have violated a restrictive endorsement, by failing to deposit the check in a Mary Tull account.

The third interpretation, the only one consistent with Bedford Bank's liability, is strained and unpersuasive. It would be unusual for a company, such as P O M International, to endorse a check with its account number only. The fact that all four lines of the endorsement are written in the same handwriting—a fact frequently cited by British Caledonian—tends to support the first interpretation.

British Caledonian nevertheless argues that any uncertainty about the correct interpretation of the endorsement presents a jury question precluding summary judgment. The interpretation of a written document, such as this endorsement, is ordinarily a question of law to be resolved by the court. *Cunningham and Co., Inc. v. Consolidated Realty Management, Inc.*, 803 F.2d 840, 842–43 (5th Cir. 1986). The jury's role is limited to resolving any preliminary factual questions that may arise. *Id.* British Caledonian has not pointed to any particular factual disputes involving the restrictive endorsement, other than the ultimate question of how that endorsement is to be interpreted. In a typical interpretation case, the intent of the author of the disputed document may form a question for the jury. In the instant case, however, it is undisputed that the authors of the forged endorsement—J. Roland Savoie and Simone Gauthier—intended Bedford Bank to read the check just as Bedford Bank did read it. Nor does British Caledonian point to any other preliminary factual issue susceptible of jury resolution. The district court, then, did not err in resolving the restrictive endorsement issue on its own and in denying British Caledonian recovery on that basis.

### E. *Mismatched Names*

British Caledonian argues that Bedford Bank's failure to notice the Tull/Toll mismatch, in addition to providing evidence of bad faith, should also preclude Bedford Bank's eligibility for the section 3.405 defense. British Caledonian contends that the burden of comparing the front and back of a check is a light one to impose on a bank.

No Texas cases address this question. British Caledonian cites several cases from other jurisdictions refusing section 3.405 protection in transactions where a forged endorsement did not exactly match the payee's name. *Twellman v. Lindell Trust Co.*, 534 S.W.2d 83 (Mo.App.1976) (front read "International Harvester," back "Roedel Brothers Internation [sic] Harvester Trucks"); *Seattle-First National Bank v. Pacific National Bank*, 22 Wash.App. 46, 587 P.2d 617 (1978) (front: "Sumner Motors, Inc."; back: "Sumner Motors"); *Travco Corp. v. Citizen's Federal Savings & Loan Association*, 42 Mich.App. 291, 201 N.W.2d 675 (1972) (front: "L & B Dist., c/o F. & B. Mitchell"; back: "F. Mitchell" and "B. Mitchell"). Of these three cases, the *Twellman* case involved a greater discrepancy between the payee and endorser's names than does the instant case. The last two cases, *Seattle-First National Bank* and *Travco*, involve a discrepancy that changed the capacity of the payee from corporate to personal.

Closer to the facts of the instant case is *Western Casualty & Surety Co. v. Citizen's Bank of Las Cruces*, 676 F.2d 1344 (10th Cir.1982). In that case, the Tenth Circuit held that a bank could shelter behind New Mexico's U.C.C. § 3.405 even though it processed a check payable to the "Grater Mesilla Valley Sanitation District" and endorsed by the "Greater Mesilla Valley Sanitation District." 676 F.2d at 1346 (emphasis added). British Caledonian points out that the spelling mistake in *Western Casualty* occurred in the payee's name, while the mistake in the instant case occurred in the endorsement. However, the reasoning of the Tenth Circuit applies to both types of mistakes. The Tenth Circuit concluded that the U.C.C.'s willingness to overlook a misspelling of a payee's name in other contexts (U.C.C. § 3.203), coupled with the decision to allocate the risk of a dishonest employee's acts on his employer (U.C.C. § 3.405, Comment 4) counsel in favor of granting section 3.405 protection to the bank, as long as the check presented "a normal appearance." *Id.*

Had Bedford Bank noticed the "Tull/Toll" discrepancy, the Bank still

would not have known which spelling was correct. It would contravene the stated purpose of section 3.405 to make the Bank's liability hinge on the fortuitous circumstance of whether a minor mistake in spelling a payee's name appears on the front or the back of a check. We find the reasoning of the Tenth Circuit persuasive, and hold that, under the circumstances of the instant case, Bedford Bank may use the section 3.405 defense despite the existence of a slight and unnoticed name discrepancy.

### F. *Interest in the Instrument*

■ Section 3.405(a)(3) applies only when "an agent or employee of the [check's] maker or drawer has supplied him with the name of the payee intending the latter to have no such interest [in the check]." British Caledonian argues that Savoie and Gauthier did intend Mary Tull Charter Services to receive an "interest" in the check, because Savoie and Gauthier actually gave Mary Tull a cashier's check for $30,600.

According to British Caledonian, the "interest in the instrument" language of section 3.405 should be read broadly to include any interest in the proceeds of a forged check. Yet the evidence shows that Mary Tull's $30,600 did not in fact come from the proceeds of the $116,000 check. Gauthier purchased the $30,600 cashier's check on March 17, 1980, at Preston State Bank. The funds from the $116,000 check were not available to Savoie and Gauthier until March 31, 1980, when Bedford Bank cleared the $116,000 for deposit. It appears to be a coincidence that Mary Tull negotiated the $30,600 cashier's check at a third bank on March 31, 1980, as well. In a memorandum submitted in a companion case, British Caledonian concedes that the $30,600 cashier's check was paid from a bogus "Air Algerie" account formed by Savoie and Gauthier with funds from *previous* illegal transactions. Record Vol. 2 at 326. In sum, even if section 3.405 includes the proceeds of a check under the term "interest," the evidence shows that Mary Tull did not receive the proceeds of the $116,000 check.

However, British Caledonian argues that there was enough evidence to create a jury issue as to whether Savoie intended Mary

Tull to have some other type of "interest" in the check. For example, British Caledonian asserts, "It is entirely possible" that Savoie planned to turn over the $116,000 check to Mary Tull for her to cash and return all but $30,600 of the proceeds to him. Appellant's Brief at 49. British Caledonian points to no evidence in the record supporting such a plan on Savoie's part. There is evidence in the record that tends to negate that plan and similar plans: the fact that Savoie and Gauthier ended up negotiating the check themselves and paying Mary Tull from a different source; Mary Tull's deposition testimony that she was surprised by the $30,600 check, that she never saw the $116,000 check or was aware of its existence. Record Vol. 2 at 364–70. As noted in the first section of this discussion, British Caledonian did not move to reopen discovery in order to gather evidence to counter Mary Tull's assertions.

■ The evidence supports the existence of some type of connection between Savoie's fraud with the $116,000 check and Mary Tull's receipt of $30,600. At best, Mary Tull may have received $30,600 to prevent her from contacting British Caledonian about an unpaid invoice; at worst, Mary Tull may have formed part of an ongoing scheme to submit false invoices to British Caledonian. But the words of section 3.405—"interest in the instrument"—cannot be stretched to cover these more remote connections. In most section 3.405 cases, the dishonest employee will use a plausible payee's name: a payee to whom his employer could owe a debt, or a payee who can be quieted with a partial payment. The drafters of the U.C.C. recognized that real payees could have some level of involvement in a forged endorsement scheme when the drafters removed the previous statute's requirement that the payee be a "'fictitious or nonexisting person.'" Tex. U.C.C. § 3.405, Comment 1. *Fidelity & Casualty Co. v. First City Bank of Dallas*, 675 S.W.2d 316, 318 (Tex.App.—Dallas [5th Dist.] 1984, writ ref'd n.r.e.). The fact that the payee may exist and the dishonest employee may send the payee some money does not, by itself, establish that the employee "intend[ed]" the payee to have an

"interest in the instrument." The district court did not err in holding that British Caledonian did not present enough evidence to create a factual issue on Savoie's intention.

### G. *Denial of Motion To Vacate Final Judgment*

The district court granted summary judgment to Bedford Bank on April 14, 1986. In October 1986, British Caledonian moved to vacate the judgment under Fed. R.Civ.P. 60(b). British Caledonian based its motion on evidence discovered in a companion case, a suit brought by British Caledonian against Texas Commerce Bank. After briefing, the district court denied the Rule 60(b) motion on December 4, 1986. Appeal from this denial was consolidated with appeal from the earlier summary judgment.

British Caledonian points to two pieces of evidence discovered after the district court's summary judgment:

(1) A deposition given by Robinson, an officer of Bedford Bank, allegedly contradicting the affidavit by Robinson attached to Bedford Bank's reply to an earlier summary judgment motion. In his affidavit, Robinson stated that he did not recall the $116,000 check, but that, under normal Bedford Bank procedures, he would have approved the check "because there are no irregularities on the check which would have given me any reason to question the check." Record, Vol. 2 at 199. In his September 1986 deposition, Robinson again stated that he did not recall the $116,000 check. In response to questioning by British Caledonian's attorney, Robinson conceded that "[k]nowing what I know now" and "[k]nowing what I know today" he might have had suspicions and have required Gauthier to show proof that she had Mary Tull's consent to deposit the check. Record Vol. 2 at 268–70.

(2) British Caledonian obtained from Texas Commerce Bank the collection form that Bedford Bank had filled out and forwarded to Texas Commerce when the check was deposited in 1980. On that form, a Bedford Bank employee, probably Jean Tedrow, the teller who processed the check, had typed "P O M International (Mary Tull Charter Services)." British Caledonian argues that the collection letter could have been used to contradict Tedrow's testimony that she did not notice that the check was not going into a Mary Tull account.

The district court denied British Caledonian's Rule 60(b) motion on the grounds that the evidence could have been discovered earlier with due diligence, and that the evidence would not have changed the result of the summary judgment. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 391 (5th Cir.1977). A district court's action on a Rule 60(b) motion is reviewed only for abuse of discretion. *Murray v. Ford Motor Co.*, 770 F.2d 461, 464 (5th Cir.1985).

In regard to the Robinson evidence, British Caledonian knew at least since the Robinson affidavit that Robinson was the officer who reviewed the $116,000 check. As discussed in an earlier section of this opinion, British Caledonian knew of the importance of Robinson's testimony, yet allowed nearly a year to pass without attempting to obtain that testimony. Moreover, Robinson hedged all of his deposition statements with "knowing what I know now" provisos. With the provisos, Robinson's deposition does not directly contradict his affidavit and is therefore of doubtful impact. The district court did not err in refusing to grant the motion on the Robinson evidence.

In regard to the collection letter, Bedford Bank's records custodian, Wanda O'Rourke, testified in 1982 that a collection letter would have been filled out for the $116,000 check, but that Bedford Bank had been unable to locate that letter. British Caledonian made no further attempt to obtain the letter from Bedford Bank. Although British Caledonian knew that Texas Commerce Bank cleared the check, British Caledonian did not attempt to obtain the collection letter from Texas Commerce before the district court ruled on the summary judgment motions. Moreover, the collection letter does not necessarily contradict Tedrow's testimony that she thought the check was going into a Mary Tull account. The words "P O M International (Mary Tull Charter Services)" might indicate Tedrow's belief that P O M was a

subsidiary or related company to Mary Tull. At worst, the collection letter would show that Tedrow did not know what relationship Mary Tull had to P O M, and wrote down both names to stay on the safe side. Thus, the collection letter would show, at most, negligence on Bedford Bank's part, not the actual knowledge British Caledonian needed to prove its case. In sum, the district court did not abuse its discretion in finding lack of materiality and due diligence as to the collection letter.

## III. CONCLUSION

The district court applied the correct legal standards under the Texas U.C.C. British Caledonian did not present enough evidence to create a genuine issue concerning Bedford Bank's good faith or the intention of Savoie. The district court did not abuse its discretion in denying British Caledonian's Rule 60(b) motion. For these reasons, the judgment of the district court is

AFFIRMED.