# United States Court of Appeals for the Fifth Circuit

No. 19-10622

United States Court of Appeals
Fifth Circuit

**FILED**

May 29, 2024

Lyle W. Cayce
Clerk

Jason Cory,

*Plaintiff—Appellee*,

*versus*

Michael Stewart; Tammy O'Connor,

*Defendants—Appellants*,

*versus*

Greg Furst; Thomas Farb,

*Defendants—Appellees*.

Appeal from the United States
for the Northern District of Texas
USDC No. 3:16-cv-01731-B

Before Richman, *Chief Judge*, Higginbotham, and Willett, *Circuit Judges*.

Per Curiam:

Tammy O'Connor and Michael Stewart (the Sellers) sold their company, Red River Solutions, LLC, to Atherio, Inc., a company led by Jason Cory, Greg Furst, and Thomas Farb (together, the Executives). The

Membership Interest Purchase and Contribution Agreement gave the Sellers nearly half their compensation upfront; they would get the rest—around $3.5 million—in ownership units and future payments. As things go, Atherio bellied-up and the Sellers received none of the promised $3.5 million. So the Sellers sued the Executives, alleging extra and intracontractual fraud under federal securities law, Delaware common law, and the Texas Securities Act. The district court granted summary judgment to the Executives on all claims. The Sellers appealed. We affirm summary judgment on the extracontractual and TSA fraud claims. But the district court erred in applying our summary-judgment standard to the federal securities law and Delaware common law claims; we reverse the summary judgment grants on those claims and remand.

## I

Atherio was a "roll-up" company, raising cash to purchase multiple companies that, when combined, create a sum greater than its parts.[1] To start, Atherio secured a "middleman" lender, Prudent Capital, to spot the nascent Atherio company-buying funds while Atherio raised investor dollars.[2] The first stop on its "roll-up" tour—Red River.

The Sellers sold Red River to Atherio for $6.75 million: $3.25 million upfront, a $1.5 million future payment, and $2 million worth of Atherio ownership units.[3] The deal closed in early 2013, enshrined in the Membership Interest Purchase and Contribution Agreement. Importantly,

---

[1] "The mechanics [of a roll-up] are relatively simple: an investor or strategic platform enters a fragmented industry . . . [and] buys several similar businesses in quick succession. Soon, a marketplace of many small businesses is replaced by a larger chain or conglomerate, and the investor has 'rolled up' the sector." David Working, *The Anatomy of a Roll-Up*, ZACHARY SCOTT (April 30, 2019), https://zacharyscott.com/the-anatomy-of-a-roll-up/.

[2] Notably, Prudent was a primary lender that gets paid back before any other claimant once Atherio raised the necessary capital (or failed to).

[3] While negotiating this deal, Atherio CEO Cory allegedly made three extracontractual misrepresentations. Because the Sellers cannot pursue extracontractual fraud claims, *see infra* section III(A), we omit the specifics.

the Agreement presented Farb as Atherio's CFO. Yet, unbeknownst to the Sellers, Farb resigned prior to deal's closing.[4]

Things quickly went south. Like dominoes, the Executives failed to raise the requisite capital, Atherio's strategic plan failed,[5] it defaulted on Prudent's loan,[6] the Executives couldn't pay the $1.5 million future payment, and the Sellers' Atherio ownership—originally worth $2 million—became worthless. The Sellers sued Atherio and the Executives (CEO Cory, former-CFO Farb, and COO Furst) for the $3.5 million promised-but-lost. Their theories: extra and intracontractual fraud under (1) federal securities law, (2) the TSA, and (3) Delaware common law. Over years of litigation, the district court entered multiple orders; the Sellers challenge three of these orders, all summary-judgment grants, on appeal:

1. the Sellers' extracontractual fraud claims are barred by the Agreement's Disclaimer of Reliance clause;

2. the Sellers' TSA claims are barred by the Agreement's Delaware Choice of Law clause; and

3. the Sellers' intracontractual federal securities law and Delaware common law claims don't meet the legal elements and fail.

## II

When reviewing summary judgment, we apply Rule 56 just as the district court did.[7] Summary judgment is proper "if the movant shows that

---

[4] Farb did continue on for three months in a distinctly reduced role as Executive Vice-President of Corporate Development.

[5] Atherio raised less than one million dollars by year-end 2013.

[6] The Sellers also allege that Cory "improperly modified" certain loan documents for another lender. And the Sellers assert that this "borrowing base fraud is [] one reason why Prudent Capital declared Atherio in default." But Prudent listed four reasons for the default, and alleged fraud was not one of them. We don't detail this evidence because the dispute it supports is not material.

[7] *Petzold v. Rostollan*, 946 F.3d 242, 247 (5th Cir. 2019) (citation omitted).

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]

## III

## A

The district court granted summary judgment to the Executives on all extracontractual fraud claims, finding that the Sellers "clearly disclaimed reliance on extracontractual representations." On appeal, the Sellers concede that the Disclaimer of Reliance clauses preclude most extracontractual fraud claims but urge that the separate Fraud Carve-Out clause revives the Sellers' right to bring *actual* extracontractual fraud claims—that is, fraud conducted knowingly. Therefore, the Sellers assert, summary judgment was inappropriate for their allegations of actual extracontractual fraud. Reviewing this purely legal question, we agree that the Disclaimer of Reliance clauses bar all extracontractual fraud claims.

The Agreement has an enforceable and applicable Delaware choice-of-law clause. Sitting in diversity, we apply the choice-of-law rules of the forum state; here, Texas.[9] And under Texas rules, "the law of the chosen state must be applied"; here, Delaware.[10] But we start with what we are applying Delaware law to. First, the Disclaimer of Reliance clauses, § 3.1(a):

> Subject to Section 3.28(d) hereof, each [Seller] represents to [Atherio] that . . . he or she is not relying on any representations or warranties made by any person or entity in his or her decision to enter this Agreement . . . to which he or she is a party . . . .

---

[8] FED. R. CIV. P. 56(a). When reviewing, we "resolve factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). But we will not consider "conclusional allegations and unsubstantiated assertions." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

[9] *InterFirst Bank Clifton v. Fernandez*, 853 F.2d 292, 294 (5th Cir. 1988) (citing *Stuart v. Spademan*, 772 F.2d 1185, 1195 (5th Cir. 1985)).

[10] *Resolution Tr. Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)). There is no dispute that the Agreement's Delaware Choice of Law clause applies to this issue.

No. 19-10622

And § 3.28(c):

> Each [Seller] hereby acknowledges and agrees that the representations and warranties of [Atherio] contained in this Agreement represent all of the representations and warranties made by it as part of the transactions contemplated hereby and [the Sellers are not] relying on any other representation or warranties (express or implied) in making its decision to consummate these transactions.

Second, the Fraud Carve-Out clause, § 3.28(d):

> [Atherio] agrees that nothing contained in this Section 3.28 or elsewhere in this Agreement shall limit the [Sellers'] right to bring claims for actual fraud . . . .

Delaware law enforces clear disclaimer-of-reliance clauses.[11] And, as long as the disclaimed reliance is clear, such clauses are enforceable even if the agreement also has a fraud carve-out clause "specifically preserv[ing] the right to assert fraud claims."[12] When an agreement has both clauses, the disclaimer of reliance defines "the contractual universe of information on which a fraud-claim can be based"[13] while the fraud carve-out "clarifies" the exact fraud remedies the parties intended "to preserve."[14]

Here, the Disclaimer of Reliance clauses are unambiguously clear. To overcome their enforceability, the Sellers make two arguments: (1) the Fraud Carve-Out renders the clear Disclaimer of Reliance ambiguous and unenforceable and (2) the Fraud Carve-Out overcomes the enforceable Disclaimer of Reliance for actual fraud claims. We find neither persuasive.

---

[11] *ChyronHego Corp. v. Wight (ChyronHego)*, No. CV 2017-0548-SG, 2018 WL 3642132, at *4 (Del. Ch. July 31, 2018) ("Delaware law enforces clauses that identify the specific information on which a party has relied and which foreclose reliance on other information." (citation omitted)).

[12] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 141 (Del. Ch. 2009).

[13] *Prairie Capital III, L.P. v. Double E Holding Corp. (Prairie Capital)*, 132 A.3d 35, 55 (Del. Ch. 2015).

[14] *ChyronHego*, 2018 WL 3642132, at *5.

We address the prongs together: Delaware precedent dictates that a clear disclaimer-of-reliance clause defines the information upon which a fraud claim may be based. In *ChyronHego*, the Delaware Chancery Court found that a disclaimer-of-reliance clause barred any extracontractual fraud claims despite the accompanying fraud carve-out.[15] The court read the fraud carve-out to "clarify[] the intent to preserve the remedies provided in [the Exclusive Remedies provision]," not to preserve a remedy for extracontractual fraud.[16] After all, the Buyers disclaimed any reliance on extracontractual information, a prerequisite to any extracontractual fraud claim; there was no remedy to preserve.

*ChyronHego* relied heavily on *Prairie Capital*.[17] That case similarly held that an effective disclaimer-of-reliance clause barred extracontractual fraud claims even though the agreement also had a fraud carve-out provision.[18] *Prairie Capital* reasoned the fraud carve-out clause certainly provided a remedy for fraud, but it "d[id] not alter the contractual universe of information on which a fraud-claim can be based"—that universe is controlled by the disclaimer-of-reliance clause.[19] Together, *ChyronHego* and *Prairie Capital* hold that a clear disclaimer-of-reliance clause controls the universe of information upon which a fraud claim can be grounded regardless of any accompanying fraud carve-out clause. Accordingly, the Sellers' contention—that the fraud carve-out renders the clear disclaimer of reliance

---

[15] *ChyronHego*, 2018 WL 3642132, at *5 ("[Seller] and the Buyer agree that [Seller didn't make any representation other than in this Agreement and the Buyer did not rely on any such representation] . . . however, . . . this Section . . . *shall not preclude the Buyer Indemnified Parties from asserting claims for Fraud [under the Exclusive Remedies provision].*" (emphasis added)).

[16] *Id.*

[17] *Id.* at *6.

[18] *Prairie Capital*, 132 A.3d at 49–56.

[19] *Id.* at 55. And, under similar facts, *Novipax Holdings LLC v. Sealed Air Corp.* held "that the parties preserved a fraud claim in [the Exclusive Remedy clause], but limited that fraud claim through the non-reliance provisions . . . ." No. CVN17C031682EMDCCLD, 2017 WL 5713307, at **11 – 12 (Del. Super. Ct. Nov. 28, 2017).

ambiguous/unenforceable    or    overcomes    the    clause    outright—is unpersuasive.

And the Sellers' efforts to distinguish this Agreement from those in *ChyronHego* and *Prairie Capital* are unavailing. Like the clauses in those cases, §§ 3.1(a) and 3.28(c) provide an explicit disclaimer of reliance on extracontractual statements that "alter[ed] the contractual universe of information on which a fraud-claim can be based."[20] And because this disclaimer is clear and enforceable, the Fraud Carve-Out clause only "clarifies the intent to preserve" the Sellers' right to sue for actual *intracontractual* fraud.[21] The Disclaimer of Reliance clauses control what type of fraud claims may be brought—extra versus intracontractual—by defining what information was relied on; here, only intracontractual. So there is no extracontractual fraud remedy for the Fraud Carve-Out to preserve because a necessary element, reliance, is contractually precluded by the Disclaimer of *Reliance* clauses.[22]

At bottom, the "drafters specifically preserve[d] the right to assert fraud claims" by including a Fraud Carve-Out clause. But they nonetheless limited the information these claims may be based on by explicitly "say[ing] so" through clear Disclaimer of Reliance clauses—fraud claims cannot be based on information outside the Agreement.[23] We thus affirm the district

---

[20] *Prairie Capital*, 132 A.3d at 55.

[21] *ChyronHego*, 2018 WL 3642132, at *5 (finding that a similar Fraud Carve-Out "clarifies the intent to preserve the remedies provided in [the Agreement] . . . . [It] signifies careful lawyering, not surplusage or meaningless verbiage.").

[22] The Sellers' cases all include already ambiguous disclaimer-of-reliance clauses rendered *even more* unclear by a conflicting fraud carve-out clause. But when there is an explicit disclaimer of reliance that alters the universe of actionable information, as here, no Delaware case says that a fraud carve-out may "unalter" it. *See, e.g.*, *Anvil Holding Corp. v. Iron Acquisition Co.*, No. CIV.A. 7975-VCP, 2013 WL 2249655 at *8 (Del. Ch. May 17, 2013); *Airborne Health*, 984 A.2d at 141; *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, No. CVN14C12112WCCCCLD, 2015 WL 5968726, at *9 (Del. Super. Ct. Sept. 25, 2015).

[23] *Airborne Health, Inc.*, 984 A.2d at 141. Moreover, this reading does not render the Fraud Carve-Out clause meaningless because the clause still clarifies the Sellers' right to sue for common-law intracontractual fraud within this complex Agreement. *See, e.g.*, *ChyronHego*, 2018 WL 3642132, at *5; *Prairie Capital*, 132 A.3d at 49–56.

court's grant of summary judgment; the explicit Disclaimer of Reliance clauses preclude all extracontractual claims.[24]

B

Next, the Sellers aim their sights on the district court's summary-judgment grant on their Texas Securities Act claims. The district court found the Agreement's broad Delaware Choice of Law clause enforceable and applicable to the Sellers' state securities fraud claim. Therefore, the court concluded, the Sellers could only sue under the Delaware Securities Act. The Sellers urge error, arguing they should be allowed to proceed under the more favorable TSA because a Delaware court would allow them to sue under this Texas statute. But the Agreement's effective choice-of-law clause mandates that, if the Sellers want to bring a state statutory claim, they may only access Delaware's statutes.

Again, we start with the contract. The Agreement's Choice of Law clause provides:

> This Agreement and all disputes [] arising out of or relating to this Agreement . . . shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles.

And, again, we apply Texas choice-of-law rules that enforce Delaware choice-of-law clauses.[25] In Texas, to access Texas law despite a Delaware choice-of-law clause, the Sellers must prove the clause is either

---

[24] We likewise find unpersuasive the supplemental authorities the Sellers have provided us through their most recent Rule 28j Letter. *See In re P3 Health Group Holdings, LLC*, No. 2021-0518-JTL, 2022 WL 15035833, at *7 (Del. Ch. Oct. 28, 2022); *Partners & Simon, Inc. v. Sandbox Acquisitions, LLC*, No. 2020-0776-MTZ, 2021 WL 3159883, at *6–7 (Del. Ch. July 26, 2021). Unlike those cases, the parties' Disclaimer of Reliance Clause unambiguously disclaims reliance on extracontractual representations, and their Fraud Carve-Out Clause does not specifically except claims of fraud from those representations.

[25] *InterFirst Bank Clifton*, 853 F.2d at 294 (citing *Stuart*, 772 F.2d at 1195); *Resolution Tr. Corp.*, 958 F.2d at 1318 (citing *DeSantis*, 793 S.W.2d at 678).

(1) unenforceable[26] or (2) inapplicable to the asserted claim.[27] But the Sellers don't pursue either of these lines of argument. Instead, the Sellers argue that they should be allowed to proceed under the more favorable TSA because the Delaware Choice of Law clause only requires us to act like a Delaware court; it doesn't prescribe which states' statutes the Sellers may sue under.

This novel argument falters at the start. Under Texas choice-of-law rules, the Agreement's Delaware Choice of Law clause is binding—we apply Delaware law, including the Delaware statues (i.e., the DSA), to the Sellers' claims.[28] And whether a Delaware court may have generally allowed the Sellers' TSA claims is inapposite; here we have a Delaware Choice of Law clause that precludes access to non-Delaware statutes. Consider *Maynard v. PayPal, Inc.*, where a Texas district court applying Texas choice-of-law rules confronted a similar issue.[29] The *Maynard* agreement had an enforceable, applicable Delaware choice-of-law clause. Nonetheless, the plaintiffs tried to assert claims under a Texas statute. The court held: "As a result of the application of Delaware law, plaintiffs cannot maintain claims under the Texas statutes."[30] So too here. The parties negotiated for this outcome; we merely hold them to their bargain.

Under Texas rules, if the Sellers want to sue under a state statute, the Agreement's enforceable, applicable Delaware Choice of Law clause mandates that state be Delaware. The Sellers contractually precluded

---

[26] *Cardoni v. Prosperity Bank*, 805 F.3d 573, 581–82 (5th Cir. 2015).

[27] *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990).

[28] *DeSantis*, 793 S.W.2d at 678.

[29] No. 3:18-CV-0259-D, 2019 WL 3552432, at *5 (N.D. Tex. Aug. 5, 2019).

[30] *Maynard*, 2019 WL 3552432, at *5. And, in *Pyott–Boone Electronics v. IRR Tr. for Donald L. Fetterolf (Dated Dec. 9, 1997)*, a Virginia district court analyzed a Delaware choice-of-law clause under similar Virginia choice of law rules. 918 F. Supp. 2d 532, 547 (W.D. Va. 2013). It held the plaintiffs couldn't sue under the Virginia Securities Act because the VSA was "virtually identical" to the DSA and, therefore, "application of the Delaware law would not appear to deprive any Virginia citizens of the protections afforded them by domestic law." *Id*. A similar result occurred *Organ v. Byron*, 435 F. Supp. 2d 388, 389–90 (D. Del. 2006) (holding that "the Delaware choice of law provision in the Merger Agreement precludes Plaintiff from making a claim based on Illinois Securities Law").

themselves from the TSA. End of story.[31] We affirm the district court's grant of partial summary judgment barring the Sellers' TSA claim.

## C

We lastly address the Sellers' remaining intracontractual fraud claims under Delaware common law and federal securities law. The district court granted the Executives summary judgment on these claims because the requisite loss causation wasn't met.[32] The Sellers disagree, arguing that there is a genuine dispute whether the Executives' intracontractual misstatement that Farb was the CFO as of closing caused the Sellers' loss. Construing reasonable inferences in the Sellers' favor, we conclude that there is a dispute whether loss causation is met, a material legal element, and reverse the district court's summary judgment grant on these claims.[33]

Because our holding rests heavily on our summary-judgment standard of review, we take it from the top. American summary judgment finds its roots in a similar device deployed by the English in their Bills of Exchange

---

[31] Well, end of this story at least. The outcome may well be different if the TSA and DSA were dissimilar such that only allowing access to the DSA would "thwart or offend [Texas] public policy." *DeSantis*, 793 S.W.2d at 677; *see also Pyott–Boone Electronics,* 918 F. Supp. 2d at 547; *Organ*, 435 F. Supp. 2d at 392–93. But that is not the case here, *compare* Del. Code Ann. tit. 6 § 73–605 (West 2018) ("Any person who . . . [o]ffers, sells or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading . . . is liable to the person buying or selling the security from or to him.") *with* Tex. Rev. Civ. Stat. Ann. art. 581–33 (Vernon's 2017) ("A person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made . . . not misleading, is liable to the person buying the security from him"), and we leave this unanswered question for Texas courts.

[32] The district court found that both federal securities law and Delaware common law have the same loss-causation requirement and applied the same summary-judgment analysis to both sets of claims. The Sellers do not dispute the district court's finding on appeal, and we proceed similarly.

[33] The Sellers also argue that the loss-causation order is moot because the disclaimer of reliance order was improper. But, as already discussed, the disclaimer of reliance order was proper and therefore this argument falls flat.

Act of 1855.[34] And summary judgment officially entered into federal procedure in 1938 when the Federal Rules of Civil Procedure, including Rule 56, were promulgated.[35] In 1939, a federal court, for the first time, granted summary judgment because the adjudication "left nothing further to be tried."[36] In 1957, a federal circuit court affirmed its first summary-judgment grant, finding "no error" with little adieu.[37] We followed suit in 1965.[38]

Today summary judgment is proper when the movant establishes " 'that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.' "[39] We apply the same standard as the district court upon review, "revers[ing] the grant of a summary judgment motion if it appears from the record that there is an unresolved issue of material fact."[40] Importantly, we do not *decide* factual disputes at the summary-judgment stage; we focus on whether there *are* material factual disputes that should be decided by a factfinder.[41] And it's the movant's burden to show the requisite lack of any genuine, material disputes.[42] Further, we must also "resolve factual controversies in favor of the nonmoving party."[43] Here, this principle carries the day for the Sellers. But,

---

[34] 10 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 2711 (4th ed.).

[35] *Id.*

[36] *Levinson v. Cohen*, 31 F. Supp. 96, 96 (S.D.N.Y. 1939).

[37] *Easter v. Gates*, 247 F.2d 78, 78 (D.C. Cir. 1957).

[38] *Moore v. Calhoon*, 343 F.2d 473, 473 (5th Cir. 1965).

[39] WRIGHT & MILLER, *supra* note 34, § 2716; *Benton-Volvo-Metairie, Inc. v. Volvo Sw., Inc.*, 479 F.2d 135, 139 (5th Cir. 1973).

[40] WRIGHT & MILLER, *supra* note 34, § 2716 (cleaned up).

[41] *Petzold v. Rostollan*, 946 F.3d 242, 247 (5th Cir. 2019).

[42] *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 7 F.3d 1203, 1206 (5th Cir. 1993).

[43] *Little*, 37 F.3d at 1075; *see also Labit v. Carey Salt Co.*, 421 F.2d 1333, 1335 (5th Cir. 1970) ("Accepting the facts most favorable to the plaintiff, there is no reasonable basis on which a jury could determine that he was injured upon navigable waters or that he was a seaman. The summary judgment was therefore proper.").

when the decision is this close, it's critical that we examine the line closely, demarcating its exact lay, before calling fair or foul.

Wright and Miller frame our summary-judgment standard like this: "[T]he party who defended against the motion for summary judgment will have the advantage of the court reading the record in the light most favorable to him . . . and will receive the benefit of the doubt when [his factual] assertions conflict with those of the movant."[44] In other words, we "view all the facts and draw all reasonable inferences in favor of the nonmoving party."[45] But our deference has a floor—reasonableness. If the nonmovant's assertions are mere "conclusory allegations," "unsubstantiated assertions," or only supported by a "scintilla of evidence," it would be unreasonable to accept them over the movant's substantiated factual assertions.[46] All this is difficult to understand in the ether, and even more difficult to apply to these hotly contested fraud claims.[47] But a few examples yield clarity.

Start with *National Hygienics, Inc. v. South Farm Bureau Life Insurance Co.*, 707 F.2d 183, 188 (5th Cir. 1983), where we reviewed a summary-judgment grant to defendants on a contractual interference claim. The law was undisputed and, on appeal, the nonmovant plaintiff urged that there was a factual dispute with respect to a necessary legal element. We agreed and reversed the summary-judgment grant. To reach this end, we considered the plaintiff's evidence and held it could "reasonably lead to a conclusion that" the requisite element was met.[48] In other words, the evidence "plausibly" supported the "not implausible" finding that this element was satisfied.[49]

---

[44] WRIGHT & MILLER, *supra* note 34, § 2716 (citations omitted).

[45] *Crawford v. Metro. Gv't of Nashville and Davidson Cnty.*, 555 U.S. 271, 274 n.1 (2009) (internal quotation marks omitted).

[46] *Little*, 37 F.3d at 1075 (internal quotation marks omitted).

[47] *Benton-Volvo-Metairie, Inc.*, 479 F.2d at 138 ("[D]ecid[ing] whether the granting of summary judgment was correct based on the evidence presented . . . is a very complex and difficult task.").

[48] *Nat'l Hygienics, Inc.*, 707 F.2d at 189.

[49] *Id.*

"[V]iewing the record in the light most favorable to [plaintiff]," we denied summary judgment.[50]

Similarly, we reversed another summary-judgment grant in *Canipe v. National Loss Control Service Corp.*, 736 F.2d 1055, 1061 (5th Cir. 1984). In that case we again found a genuine factual dispute as to a necessary legal element, despite defendant's evidence to the contrary, relying on "evidence in the record implying that" the element was met. Because "[i]t cannot be disputed that [the element] *might*" have been satisfied, summary judgment was improper.[51]

To cap off, in *Lytle v. Bexar County*, 560 F.3d 404, 412 (5th Cir. 2009), we again reversed a summary-judgment grant, adhering to the maxim, "we are limited to assuming that any and all questions are resolved in the plaintiff's favor, tempered by the limits of reasonableness."[52] Of particular note, we stated:

> The meager record at this point of the proceedings has mandated a number of inferences, and the factual assumptions on which we have decided this appeal might bear little resemblance to what the factfinder ultimately determines. But it is the job of the factfinder, not this court, to ultimately resolve the factual disputes and make the inferences that fill the gaps in the facts.[53]

Lastly, when a nonmovant offers non-conclusory summary-judgment evidence, we construe all reasonable interferences and assumptions from that evidence in their favor—even if the movant offered contradictory evidence. As long as the nonmovant's evidence "reasonably lead[s]" to the "not implausible" conclusion that all the necessary legal elements are (or are not)

---

[50] *Id.*

[51] *Nat'l Loss Control Servs. Corp.*, 736 F.2d at 1062 (emphasis added); *see also U.S. Small Bus. Admin. v. Beaulieu*, 75 F. App'x 249, 253 (5th Cir. 2003) (reversing a summary-judgment grant "[b]ecause the record does not conclusively show that [defendant's conduct meets a required element]").

[52] *Lytle*, 560 F.3d at 417.

[53] *Id.*

met, summary judgement is improper.[54] It is the factfinder's job, not ours, to "make the inferences that fill the gaps in the facts."[55] In turn, we will affirm a summary-judgment grant only if the record *conclusively* establishes that the necessary legal elements are (or are not) met; if there is evidence (or lack a thereof) that "implies" a material factual dispute, summary judgment is improper.[56] And to top it all off, it's the movant's burden to show that summary judgment *is* proper.[57]

We next move to the substantive standards we apply to the Sellers' intracontractual fraud claims. For a successful private claim under § 10(b) of the Exchange Act and SEC Rule 10b–5 (together, federal securities law), the Sellers must prove six elements.[58] At issue here is element number six, loss causation.[59] "Loss causation . . . demands a causal connection between the [alleged material] misstatement and [the Sellers'] claimed economic loss."[60] The law is fairly clear on loss causation in the public-market context, but this fraud case arose in the *private* market. Few courts have addressed how to show loss causation in this context.

In fraud-on-the-public-market cases, plaintiffs prove loss causation by showing (1) there was misstatement and, when the "negative 'truthful' information" rectifying this misstatement came to light, this "caus[ed] the

---

[54] *Nat'l Hygienics, Inc.*, 707 F.2d at 189.

[55] *Lytle*, 560 F.3d at 417.

[56] *Beaulieu*, 75 F. App'x at 253; *Canipe*, 736 F.2d at 1061.

[57] *Travelers Ins. Co.*, 7 F.3d at 1206.

[58] *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681 (5th Cir. 2015). Again, we are also addressing the Sellers' Delaware common-law claims through this 10b-5 analysis. *See supra* note 32.

[59] The district court found all the other elements were met, except for the transaction reliance element—which addresses whether the Sellers would have entered the transaction itself but for the misstatement—which the court did not reach.

[60] *Ludlow*, 800 F.3d at 681–82 ("A plaintiff must prove that the misstatements— not 'other intervening causes, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" '—were the cause of her claimed economic injury" (citation omitted)); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

decrease in [stock] price" (i.e., the economic loss) and "(2) that it is more probable than not that it was" the negative truth coming to light, "not other unrelated negative statements, that caused a significant amount of the decline."[61] In other words, there was a misstatement, the truth came out, the stock price dropped, and the plaintiffs must prove the revelation was "more probably than not" the cause of *most* of the stock price's drop.[62] But, as the district court noted, "fraud-on-the-market cases focus on the effect a price-inflating misrepresentation and subsequent disclosure has on a security's price in the marketplace. Here, there was no marketplace for the disclosure of negative truthful information to cause a price decline."

In our private-market context, we have a misstatement in the Agreement and a drop in the value of Atherio ownership units. There was no "truth" *revealed* that affected Atherio's stock price. And, without the subsequent public market drop, we cannot graft our public market loss causation analysis directly onto private market loss causation. Because we have not dealt with loss causation in the private market before, we look to the persuasive Third Circuit case *McCabe v. Ernst & Young, LLP.* for guidance.[63]

In that case, the buyers (plaintiffs) bought stock in the sellers' (defendants') private company.[64] But, in the agreement governing this transaction, defendants misstated that their company was not subject to serious legal risk.[65] The company soon lost a major lawsuit; around the same time, plaintiffs' stock fell in value.[66] So plaintiffs sued for securities fraud. The Third Circuit found no "genuine dispute as to loss causation" because there was no evidence that "the falling price of [the seller's] stock was attributable to . . . associated threats of litigation . . . ."[67] The test it applied:

---

[61] *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004).

[62] *Id.*

[63] 494 F.3d 438–39 (3d Cir. 2007).

[64] *Id.* at 421–22.

[65] *Id.*

[66] *Id.* at 422.

[67] *Id.* at 436.

"[W]hether [defendant's misstatement] was a substantial factor in causing the [] Plaintiffs' economic loss includ[ing] considerations of materiality, directness, foreseeability, and intervening causes."[68]

We adopt this test. "[T]o satisfy the loss causation requirement" in the private market context, "the plaintiff must show that the . . . [misstatement] was a *substantial factor* in causing . . . actual economic loss for the plaintiff."[69] To make this substantial-factor showing, the Sellers must produce evidence that "certain [misstated] risks are responsible for [their] loss" and that such evidence must "reasonably distinguish the impact of those risks from other economic factors."[70] Importantly, the Sellers do not have to show loss causation for their entire loss, only "some rough proportion of the whole loss."[71]

We've divined our substantive standard. Time to apply it. To start, it's helpful to identify what matters—the security transaction, misstatement, and economic loss.[72]

    (1)  Transaction: the sale of Red River to Atherio.

    (2)  Misstatement: Farb was Atherio's CFO at the time of closing.[73]

---

[68] *Id.*

[69] *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) (emphasis added) (citing *McCabe*, 494 F.3d at 425–26).

[70] *Nuveen*, 730 F.3d at 1123; *see also, e.g.*, *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (stating that, to meet loss causation, the plaintiffs must "present evidence suggesting that the declines in price were the result of . . . the truth and not some other factor"); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[A] misstatement . . . is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the [misstatement] . . . .").

[71] *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). Moreover, the Sellers' argument that a lower standard should apply to private market securities cases than public market cases has no support. Instead we follow the *Nuveen* court and reject this argument; a lower standard for private sales "collapses transaction causation with loss causation." 730 F.3d at 1119 (refusing to apply a lower loss causation standard in an illiquid, inefficient market).

[72] *Ludlow*, 800 F.3d at 681.

[73] This misstatement is created by two provisions: (1) § 4.6—where Atherio omitted its severance obligations to ex-CFO Farb along with its other "liabilities"—and

(3) Economic loss: the unearned $1.5 million payment and "$2 million" worth of Atherio ownership units rendered worthless due to Atherio's demise.

Turning to the question at hand: Did the Seller offer evidence sufficient to generate a genuine dispute regarding whether the misstatement was a substantial factor in some of Atherio's devaluation? We start by pinpointing the Sellers' evidence, three emails from Farb stating:[74]

(1) Email One: "We today acquired two IT Services companies and go from 4 employees to 300 . . . . We have been so focused on the deal side and the financing, we haven't done any planning for when we own the companies . . . . Can't believe we now own three companies after so much work for so long. We have a ton to do!"

(2) Email Two: "Unfortunately, I received two big disappointments late yesterday from John Tucker and Patrick Flynn both of whom I thought-were high probability to invest. Both had some commonality of sentiment. *Patrick felt with my leaving he doesn't want to put more in* since it is a long term investment and he invests in people . . . . John (was planning on $30k) said similar *about not investing if I am only there for a transition period*."

---

(2) the Agreement's capitalization table misrepresenting Farb as the "Chief Financial Officer." Because there is an omission and a misrepresentation, we refer to the combined alleged fraudulent act—misstating Farb's CFO role—as a "misstatement." *See, e.g.*, *Ludlow*, 800 F.3d at 681–82 (doing the same).

[74] This is the only evidence brought to the district court's attention and we don't consider the Sellers' additional evidence highlighted for the first time on appeal. *Johnson v. Talley*, 243 F. App'x 10, 11 (5th Cir. 2007) ("Because these arguments are being raised for the first time on appeal, we do not consider them." (citing *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999)). We note that the Sellers also point to Farb's deposition testimony where he asserts, if he had remained as CFO, he wouldn't have joined Cory in submitting false loan documents to a lender. *Supra* note 6. But the argument this supports falls short: The Sellers' loss, spurred by Atherio's devaluation, was not caused in any material part by Cory's submission of these allegedly false documents. Atherio's default on its Prudent loan certainly contributed to its devaluation, but Prudent cites four reasons for the default and Cory's submission wasn't one of them. Because Atherio would have defaulted on this loan regardless of Cory's allegedly false submission, any dispute Farb's testimony generates is not material.

(3) Email Three: "We are a new company . . . [The banks] have to feel that the numbers are solid. It is more important than you think it is. They will poke at them. I know how to make the numbers look better than they are. *I know that if I am given the time to put together the kind of package for them they expect that it will greatly reduce our risk of failure.* I know that there are certain things we need to add . . . and certain formats, that will give them confidence they have real numbers . . . . Jason, these guys think differently than you . . . . As much as they love you, . . . *You need drab, mundane guys like me . . . to give them confidence in the whole project.*"

The district court considered this evidence, concluded that "Farb as CFO was [not] a necessary element to Atherio's success" and therefore loss causation was not met, and granted the Executives summary judgment. To start, we note that the district court erred by not construing all reasonable inferences in the Sellers' favor.[75] But that does not end our inquiry. Reviewing de novo, the Sellers' evidence creates a factual dispute whether the Executives' misstatement of Farb's CFO role was a substantial factor in some "rough proportion" of the Sellers' $3.5 million loss.[76]

With inferences drawn in the Sellers' favor, these three emails lead to the "not implausible" and "reasonable" conclusion that Atherio was not

---

[75] We pause to specify a few of the district court's errors, which the partial dissent now repeats. For example, it stated "[i]t is unclear how [Email One] would show that Farb's resignation as CFO post-close would cause Atherio to collapse . . . ." But such unclarity should have been resolved in the Seller's favor. *Lytle*, 560 F.3d at 417 (it is the factfinder's job, not ours, to "make the inferences that fill the gaps in the facts"). And the district court committed the same error when it found that the Sellers' evidence was insufficient to show "Farb's departure caused two 'high probability' investors to back out, impairing Atherio's ability to perform the basic business functions of accumulating capital." The court also hypothesized reasons why the investor defections were due to reasons other than Farb's departure; such conjecture in favor of the Executives was improper. *Cf. Canipe*, 736 F.2d at 1062. And the district court's single-line analysis that "Cory's wrongful acts as CEO of Atherio would seem to be a superseding cause to the demise of Atherio and any economic loss Plaintiffs suffered" was similarly erroneous. Asserting that another factor "would seem to" have caused the loss is again at odds with our mandate to construe all reasonable inferences and assumptions from the Sellers' evidence in their favor. *Cf. Lytle*, 560 F.3d at 417.

[76] *Lattanzio*, 476 F.3d at 158.

effectively managed, had a lessened chance of success, and that two investors backed out, all due to Farb's resignation.[77] As a result, the emails generate a dispute as to whether Farb's resignation was "responsible for [some of the Sellers'] loss" and "reasonably distinguish[able]" from other economic factors causing some part of Sellers' $3.5 million loss—in other words, a substantial factor.[78] The cascading "gaps in the facts"—gaps that must be construed in the Sellers' favor—generate a genuine dispute as to whether the material loss causation element was met; the Executives didn't meet their burden and summary judgment was improper.[79]

More specifically, three emails show that, had Farb been the CFO as promised, Atherio would have been better positioned to fundraise— including having two more investors—and its management would have been better prepared to execute Atherio's strategic plan. And, if Atherio had more capital and better preparation, it is "not implausible" that it would have been less of a failure, reducing the Sellers' loss.[80] To counter, both the dissent and the Executives assert that the district court got it right because the Sellers' evidence is too "minimal" or "insufficient" to preclude summary judgment on loss-causation grounds.[81] But, viewing the evidence in the Sellers' favor, they adequately allege that at least some of Atherio's devaluation was caused by Farb's non-CFO status. In other words, if Farb was the CFO as stated in the Agreement, the Executives would have had a better team, more money,

---

[77] *Nat'l Hygienics, Inc.*, 707 F.2d at 189.

[78] *Nuveen*, 730 F.3d at 1123; *see McCabe*, 494 F.3d at 425–26.

[79] *Lyle*, 560 F.3d at 417.

[80] *Nat'l Hygienics, Inc.*, 707 F.2d at 189. The district court only reached a contrary conclusion because it credited the Executives' assertions over the Sellers' evidence; but weighing evidence is inappropriate at the summary-judgment stage. *Davenport*, 891 F.3d at 167 ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (cleaned up)).

[81] Notably, the Executives don't argue that the Sellers' two emails are too "conclusory"—i.e., improper for consideration at the summary-judgment stage. In any event, this line of argument is a nonstarter. *Cf. Travelers Ins. Co.*, 7 F.3d at 1207 (highlighting that "conclusory allegations supported by a conclusory affidavit" were improper summary-judgment evidence).

and been more successful—all plausible inferences when the evidence is construed in the Sellers' favor.[82]

Case-in-point: The investor-defection email, viewed in the Sellers' favor, indicates that Atherio lost investment dollars due to Farb's non-CFO status—these lost dollars directly compose *some* of the Sellers' loss.[83] Even more, Farb himself stated that he alone among the Executives could put together "the kind of [fundraising] package . . . [investors] expect that [] will greatly reduce [Atherio's] risk of failure." Between the investor defections and the management team's downgraded capabilities without Farb, a factfinder could certainly conclude that Farb's departure was a "substantial factor" in some part of Atherio's demise and the Sellers' corresponding loss.[84] As cherry on top, the Executives bear the burden to show the lack of a genuine dispute of material fact; they didn't.

The dissent, for its part, dismisses the investor-defection email as irrelevant for two reasons: first, because the Sellers did not provide evidence that "potential investors in fact declined to invest" and second, because one of the investors "was only considering a $30,000 investment" and thus their decision not to invest could not have been "the cause of the Seller's $3.5 million loss."[85] Respectfully, we think this "seriously misapplies the summary judgment standard."[86]

---

[82] *Cf. Canipe*, 736 F.2d at 1061.

[83] As shareholders, the Sellers' had a right to their pro rata ownership of Atherio's assets, including investor dollars, subject only to creditors and preferred shareholders. *See* John B. Guerard, Jr. & Eli Schwartz, Quantitative Corporate Finance 413 (2007) (stating that "the stockholders own the firm" and are entitled to the delta between the firm's assets and liabilities). And, though one of the lost investors was only contemplating a $30,000 investment, the other investor's magnitude is unknown. Further, the Executives offer no evidence that these investors actually invested; therefore, we infer at the summary-judgment stage that these investors did in fact defect per Email Two.

[84] *Nuveen*, 730 F.3d at 1119 (citing *McCabe*, 494 F.3d at 425–26).

[85] *Post*, at 27 (Richman, C.J., concurring in part and dissenting in part).

[86] *Id.* at 24.

The dissent specifically suggests that the "most" we can take from the email is that the potential investors "were considering not investing due to Farb's departure, among other reasons."[87] But the email can plausibly, if not reasonably, be read to say more than that. As Farb stated, one of the potential investors said that "he doesn't want to put more in." Construing that expression as mere consideration to not invest more is to do precisely what our standard of review instructs us to avoid: to make an unfavorable inference from the nonmovant's evidence.[88] The dissent makes the same mistake with respect to the amount of money involved. While it is true that the $30,000 from John Tucker is not a significant amount compared to the Seller's $3.8 million loss, Farb's email does not mention how much the other investor (Patrick Flynn) planned on investing, and it seems the dissent (again and erroneously) draws the unfavorable inference that it was also a comparatively insignificant amount. With the limited evidence before us, we are not prepared to speculate how much Tucker was intending to invest, and for that reason we also not prepared to unequivocally say, as the dissent does, that there is no evidence "that the lack of these two investments was the cause of the Seller's $3.5 million loss."[89]

The dissent similarly dismisses the third email from Farb, which made clear that "it was [his] role to make the lenders comfortable with the company's financial position, and that [he] was confident in his ability to do so."[90] This email is irrelevant, in the dissent's view, because (1) it "is not evidence" that Farb had put the promised financial package together for the banks before his resignation and (2) there were "four other individuals [who] would give the lenders confidence in the project."[91] As far as we can tell, there is no evidence in the record, either way, of whether Farb had the time to "put together the [financial] package" for the banks, so the dissent seems

---

[87] *Id.* at 27.

[88] *See supra*, notes 39–57 and accompanying text.

[89] *Post*, at 27 (Richman, C.J., concurring in part and dissenting in part).

[90] *Id.* at 28.

[91] *Id.*

to take sides on this open fact question by resolving it in favor of the Executives.[92] We also cannot downplay Farb's role in the transaction, as the dissent does, by pointing out that there were other individuals who could give the banks confidence in the project. Thus, while the dissent says we cannot make much of these emails, it simultaneously reaches the rather significant conclusion that Farb could not have been that important after all because some other people were offhandedly mentioned in the email. At the risk of repeating, we cannot make these unfavorable inferences and conjectures against the nonmoving party, especially a series of them.

Ultimately, the Sellers offer multiple emails that, with inferences construed in their favor, show (1) two investors dropped out and (2) Atherio was mismanaged and ill-prepared, both due in part to Farb's not being the CFO. This evidence "reasonably lead[s]" to the "not implausible" conclusion that "some rough proportion" of Atherio's devaluation, and the Sellers' correlated loss, is properly attributed to Farb's non-CFO status.[93] Sure, this premise is founded on assumptions and inferences. And yes, the record doesn't conclusively establish that Farb's non-CFO status was a substantial factor in the Sellers' loss. To be sure, there may be a web of factors that caused Atherio's demise. And the Sellers' evidence in no way distinguishes the damage to Atherio caused by all other potential business risks versus the damage caused by Farb's undisclosed departure. But that is exactly why summary judgment is not appropriate: "it is the job of the factfinder, not this court, to ultimately resolve the factual disputes and make the inferences that fill the gaps in the facts."[94] The Sellers offer sufficient evidence plausibly supporting the reasonable conclusion that Farb not being the CFO was a substantial factor in at least some of Atherio's demise and, therefore, the Sellers' corresponding loss. And it is the factfinder's role—not ours—to sort out who is right. We therefore reverse the district court's

---

[92] *See Lytle*, 560 F.3d at 417 (stating that it is the factfinder's role to "make the inferences that fill the gaps in the facts").

[93] *Nat'l Hygienics, Inc.*, 707 F.2d at 189.

[94] *Lytle*, 560 F.3d at 417.

No. 19-10622

summary-judgment grant on the federal securities law and Delaware common law claims and remand.[95]

IV

We AFFIRM the district court's grant of summary judgment to the Executives on the extracontractual and TSA claims. But we REVERSE the district court's summary-judgment grant to the Executives on the federal securities law and Delaware common-law claims and REMAND these claims to the district court for further proceedings consistent with this opinion.

---

[95] The district court did not address either the transaction-reliance element of the Sellers' claims or Cory's alternative argument that he is not a party to the contract. On remand, the district court may consider whether the Sellers relied on the Executives' misstatement of Farb as CFO and any alternative argument on this issue that has been properly preserved. *Ludlow*, 800 F.3d at 681–82.

PRISCILLA RICHMAN, *Chief Judge*, concurring in part, dissenting in part:

I would affirm the district court's judgment across the board. Accordingly, I concur in affirming the district court's grant of summary judgment to Jason Cory, Greg Furst, and Thomas Farb (the Executives) on the extracontractual and Texas Securities Act claims brought by Tammy O'Connor and Michael Stewart (the Sellers), and I dissent from the reversal of the district court's grant of summary judgment on the intracontractual fraud claims under federal securities law and Delaware common law.

The panel majority opinion seriously misapplies the summary judgment standard. The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[96] But the initial burden is "only [to] point out the absence of evidence supporting the nonmoving party's case."[97] The movant is not required to negate the elements of the nonmovant's claim.[98] Instead, if the initial burden is met, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."[99] The Executives, who moved for summary judgment, asserted there was no evidence of loss causation. They pointed out there was no evidence that two particular investors declined to invest when they learned Tom Farb would not be the CFO indefinitely, but only for a transition period. The Sellers did not meet this assertion with evidence that these two potential investors did not, in fact, invest. The panel's majority opinion improperly says that we must "infer" that the potential investors did not invest. Such an inference cannot be made from the emails cited by the majority opinion. The majority panel then compounds its error by expressly

---

[96] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[97] *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992) (internal quotation marks omitted) (quoting *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990)) (alteration in original).

[98] *Celotex*, 477 U.S. at 323.

[99] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 324).

and erroneously holding not only that the Sellers were not required to come forward with evidence to respond to a "no evidence" assertion, but also holding that the *moving* party must come forward with evidence to negate an element of the plaintiffs' claim, saying: "the *Executives* offer no evidence that these investors actually invested; therefore, we infer at the summary judgment stage that these investors did in fact defect per Email Two."[100] This is flatly wrong.

## I

The Executives asserted in the district court and maintain on appeal that there is no evidence of loss causation. The district court granted summary judgment in favor of the Executives. In determining whether the district court erred, "we are required to view all facts and draw all reasonable inferences in favor of the nonmoving part[ies],"[101] who in the present case are the Sellers. "We do not, however, in the absence of any proof, assume that the nonmoving part[ies] could or would prove the necessary facts."[102] The Sellers' "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[103] "The test is identical to that used for a directed verdict: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[104] If the Sellers fail to meet this burden, the Executives' motion for summary judgment was properly granted.[105]

---

[100] *Ante*, at 20 n.83 (emphasis added).

[101] *Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 274 n.1 (2009) (internal quotation marks omitted) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam)).

[102] *Little*, 37 F.3d at 1075.

[103] *Id.* (internal citations and quotation marks omitted).

[104] *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992) (internal quotation marks omitted) (quoting *Chiari v. City of League City*, 920 F.2d 311, 314-15 (5th Cir. 1991)).

[105] *Little*, 37 F.3d at 1076.

No. 19-10622

Appling this standard, we are left with the substantive issue: Did the Sellers offer sufficient evidence to generate a genuine dispute regarding whether the Executives' misstatement of Farb's role as CFO was a substantial factor in the Sellers' $3.5 million loss?  The Sellers' evidence consists of three emails from Farb.  The majority opinion concludes that, after drawing all reasonable inferences in the Sellers' favor, the emails create a factual dispute as to whether the misstatement was a substantial factor in the Sellers' loss.  I disagree.

In the first email, Farb states in pertinent part:

> We today acquired two IT Services companies and go from 4 employees to 300 . . . .  We have been so focused on the deal side and the financing, we haven't done any planning for when we own the companies . . . .  Can't believe we now own three companies after so much work for so long.  We have a ton to do!

This is an admission that, even with Farb on board, the Executives had not "done any planning for when [they] own the companies."  The email does not state or even imply that Farb was necessary to run the company, or that the management team was not prepared to run the company without him.  Accordingly, the email is not evidence, and does not support a reasonable inference, that the Sellers' loss was caused by Farb stepping down as CFO.

The Sellers argue that a second email from Farb to Cory is evidence that two "high probability" individuals declined to invest in the company because of Farb's resignation.  The relevant passages in the email are set forth in the margin.[106]  Farb informs Cory that two individuals "had some

---

[106] The August 10, 2013 email composed by Farb said:

Unfortunately, I received two big disappointments late yesterday from John Tucker and Patrick Flynn both of whom I thought were high probability to invest.  Both had some commonality of sentiment.  Patrick felt with my leaving he doesn't want to put more in since it is a long term investment and he invests in people.  I obviously told him I am not leaving for a while and the company has a great board.  He also is puzzled as to why Mark hasn't joined full-time yet and concerned. Doesn't look like the experienced team in the deck is there.  He had heard several times Mark

commonality of sentiment" about "not investing if I am only there for a transition period." In addition, one of the individuals was concerned that "Mark" had not yet joined the management team full time. That potential investor was also "very put off" by a press release. The email reflects that Farb urged the individuals to go forward with the investments. In response to Farb's email, Cory wrote back that he would also talk to these two potential investors.

At most, this exchange of emails shows that the individuals were considering not investing due to Farb's departure, among other reasons. As the district court recognized, the Sellers have not offered any evidence that the individuals actually declined to invest. While we draw reasonable inferences in the Sellers' favor, we do not assume, without evidence, that the Sellers would be able to prove that the potential investors in fact declined to invest. We simply do not know one way or another whether the individuals invested. Further, one individual was only considering a $30,000 investment. The amount the other was considering investing is unknown. The exchange of emails does not support a reasonable inference that the individuals did not invest or that the lack of these two investments was the cause of the Sellers' $3.5 million loss. The Sellers have not raised a genuine dispute.

The panel's majority opinion states that because "the Executives offer no evidence that these investors actually invested . . . we infer at the

---

was going to join and it seems elusive. I assured him it would happen. He thinks highly of you and Greg but it is not the balanced team that he thought he was investing in. Jason, I think there is a message here -- pull your team together and get Mark firmly in the company.

John (was planning on $30k) said similar about not investing if I am only there for a transition period. He was also very put off by the press release he saw on Prudent. He asked me if I had been involved in the press release, which I hadn't. He said he thought so because Tom Farb would never have let that press release go out. He said looked like one sent by sales guys -- superlatives and lacking in content. He worked for me as head of sales, by the way, so he is a sale guy himself. By the way, if you want me to assist in raising funds and I have an EVP title, I would have liked to have had input on that press release.

summary judgment stage that these investors did in fact defect."[107] However, as noted, this misapplies the proper summary judgment burden. There is no burden on the Executives to show that the individuals actually invested, or that even if they did not invest, only de minimis amounts were at issue. Instead, the Sellers have the burden to produce evidence to raise a genuine dispute as to whether the potential investors backed out. Either they did or they did not. We cannot infer that they did. The Sellers have not met their burden.

## II

Nor does the final email support that the company had a lower chance of success without Farb as CFO. The email, sent seven months prior to Farb's resignation, states:

> We are a new company . . . . [The banks] have to feel that the numbers are solid. It is more important than you think it is. They will poke at them. I know how to make the numbers look better than they are. I know that if I am given the time to put together the kind of package for them they expect that it will greatly reduce our risk of failure. I know that there are certain things we need to add . . . and certain formats, that will give them confidence they have real numbers . . . . Jason, these guys think differently than you . . . . As much as they love you, . . . You needd [sic] drab, mundane guys like me (and Mark and Greg and Michael and John), to give them confidence in the whole project.

The email establishes that it was Farb's role to make the lenders comfortable with the company's financial position, and that Farb was confident in his ability to do so. However, the email is not evidence that when Farb resigned, seven months later, he had not had "time to put together the kind of package" the banks expect, or that the company would no longer be effectively managed without him. In fact, Farb listed four other individuals that would give the lenders confidence in the project. A reasonable inference

---

[107] *Ante*, at 20 n.83.

No. 19-10622

cannot be drawn from this email that the Sellers' loss was due to Farb's resignation.

The evidence offered by the Sellers does not raise a genuine dispute regarding whether the Executives' misstatement was a substantial factor in the Sellers' $3.5 million loss. Therefore, I would affirm the district court's grant of summary judgment on the intracontractual federal securities law and Delaware common law claims.

* * * * *

I respectfully concur in part and dissent in part.